### Ann MEYER, Plaintiff,

v.

### HARTFORD LIFE AND ACCIDENT INS. CO., Defendant.

### No. 8:03–CV–666–T–26MSS.

United States District Court,
M.D. Florida,
Tampa Division.

April 24, 2004.

John V. Tucker, Anderson & Tucker, St. Petersburg, FL, for plaintiff.

Ralph C. Losey, Akerman Senterfitt, Orlando, FL, for defendant.

## ORDER

LAZZARA, District Judge.

This cause comes before the Court on Defendant's Motion for Summary Judgment With Incorporated Memorandum of Law (dkt. 20), Statement of Undisputed Facts (dkt. 21), and supporting exhibits (dkt. 22), and Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment (dkt. 34). Also before the Court are Plaintiff's Motion for Summary Judgment (dkt. 27), memorandum of law (dkt. 28), and supporting exhibits (dkt. 29), and Defendant's Response to Cross–Motion for Summary Judgment (dkt. 36) and Statement of Disputed Facts (dkt. 37). After careful consideration of the arguments, the applicable law, and the file, the Court concludes that Defendant's Motion for Summary Judgment (dkt. 20) should be granted, and that Plaintiff's Motion for Summary Judgment (dkt. 27) should be denied.

### Plaintiff's Claims

This is an action brought by Plaintiff Ann Meyer ("Meyer") under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, et seq., for long-term disability ("LTD") benefits under a Group Long Term Disability Benefits Plan ("the Plan"). Plaintiff, a former employee of Publix Supermarkets, Inc. ("Publix"), alleges that she is entitled to benefits under the Plan because she is totally disabled from performing the material duties of her own occupation due to Bell's Palsy.

### Factual Background

Meyer became employed by Publix on November 10, 1990. She became an insured participant in the Publix LTD Plan on September 1, 1993, and continued working until September 8, 2000. (Dkt. 12, ex. B, Administrative Record ("A.R."), pp. 34–

35.) When she last worked, she was employed by Publix as a pharmacy technician earning $2,004.97 per month, working four days per week, ten hours per day. Meyer stopped working on September 8, 2000 as a result of a facial and trigeminal nerve palsy (referred to as "Bell's Palsy"), which caused paralysis to the right side of her face. (A.R. 48 & 81.) The paralysis apparently resulted from a herpes zoster infection (referred to as "shingles"). (*Id.*) Plaintiff immediately sought treatment from various medical providers and while Plaintiff initially experienced some improvement following the onset of her paralysis, she continued having pain and numbness into 2001. (A.R. 64–67 & 84.)

Meyer filed her LTD claim on January 9, 2001, claiming that she had been prevented from working since September 8, 2000, because "the [r]ight side of [her] face (eye, ear, nose, mouth) has nerve damage." (A.R. 39 & 44–49.) She listed her treating medical providers for this condition as Dr. William F. Rowland ("Dr. Rowland"), for providing initial treatment; Drs. Stuart Strikowsky ("Dr. Strikowsky") and Roberto Bellini ("Dr. Bellini"), for emergency room treatment; Dr. William L. Taldone ("Dr. Taldone"), an ophthalmologist; Dr. Mitchell B. Miller ("Dr. Miller"), an otolaryngologist; Dr. Thomas H. Harrison ("Dr. Harrison"), a neurologist; and Florida Community Imaging Center ("FCIC"). (A.R.43–44.)

The Plan at issue has been in effect since September 1, 1993. (Dkt. 12, ex. A, SPD CERT. 14.) The Plan is an employee welfare benefits plan sponsored and administered by Publix. The LTD benefits provided under the Plan are funded through a group policy issued by Defendant Hartford Life and Accident Insurance Company ("Hartford") to Publix. Hartford serves as Claims Administrator for the Plan, and, in this capacity, decides claims and appeals for benefits to the Plan's terms. The Plan clearly provides Hartford with discretionary authority, stating, "[t]he Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (SPD CERT. 14, 26–28, & 38–39.) The Booklet/Certificate is the Plan document governing claims under the Plan, and the document applied by Hartford's claims examiners to determine such claims. (*Id.*) The Summary Plan Description ("SPD") references and incorporates the Booklet–Certificate as the controlling Plan document. (A.R.22–27.)

The Plan defines "Totally Disabled" as follows:

(1) during the Elimination Period; [1] and

(2) for the next 24 months, you are prevented by Disability form doing all the material and substantial duties of your own occupation on a full-time basis. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are, or could become, qualified by:

(1) training;

(2) education; or

(3) experience.

---

1. "Elimination Period" is defined as:
 [T]he period of time you must be Totally Disabled before benefits become payable. The Elimination Period for this Plan is the first 90 days of any one period of Total Disability.
 If you cease to be Totally Disabled and return to work for a total of 14 days or less during an Elimination Period, the Elimination Period will not be interrupted or extended.
 Except for the 14 days or less you work, you must be Totally Disabled by the same condition for the total Elimination Period. (*See* SPD CERT. 29.)

(*See* SPD CERT. 35.) Thus, for the Elimination Period and the following 24 months, the question is whether a claimant is disabled from performing the material and substantial duties of her own occupation on a full-time basis. After 24 months of benefits, the question is whether a claimant is disabled from performing the duties of any occupation for which the claimant is reasonably qualified by training, education, or experience.

In support of her LTD application, Meyer submitted an Attending Physician Statement ("APS"), dated January 15, 2001, from her treating neurologist Dr. Harrison. (A.R.4–5.) Dr. Harrison diagnosed "facial and trigeminal nerve palsy" causing "paralysis of [right] side of face." (A.R.5.) Dr. Harrison stated that Plaintiff had a "blurring of vision [in the right] eye" and difficulty [of] verbal communications," and that Plaintiff "can't blink right eye, at time must be covered." (A.R.4.) Dr. Harrison set forth no restrictions on Plaintiff's ability to stand, walk, sit, lift/carry, reach/work overhead, push, pull, drive, or keyboard use and repetitive hand motions. (A.R.4.) Dr. Harrison further noted that Plaintiff's condition was "improved." (A.R.5.)

Hartford obtained from Publix a job description for Plaintiff's position as pharmacy technician. This job description showed that Plaintiff had to initiate refill requests, handle customer printouts, ensure the proper display of the product on shelves, order and receive prescription drugs and supplies, generate and reconcile third-party billing, dispose of outdated merchandise, enter information into the pharmacy computer system, reconcile insurance discrepancies, and utilize interpersonal skills. (A.R.33.) These responsibilities physically required Plaintiff to stand, walk, interact with customers, and lift and carry pharmacy merchandise (*Id.*) Nothing in the job description indicated that Plaintiff needed to have depth perception or the use of both eyes. (*Id.*)

In reviewing Meyer's initial claim, Hartford sought and obtained medical records from Meyer's treating providers. Dr. Harrison's records show that his APS was based on a single office visit with Meyer on December 21, 2000. (A.R. 5 & 58–60.) At that visit, he conducted a neurological evaluation of Meyer and concluded: "(a) normal language; (b) full visual fields to confrontation. Acuity normal; (c) pupils equal, round, reactive to light; full extraocular movements; (d) symmetrical palate; and (e) normal tongue movement." (A.R.58–60.) The records of Dr. Harrison show another appointment with Meyer on March 6, 2001, at which time he noted the continued improvement of Meyer's condition:

> [Plaintiff] has had some return of motor function in the right side of her face but unfortunately there is a misdirected regeneration and she has a blinking jaw. She still has some decreased sensation in the right side of her face and hyperacusis in the right ear. She can keep her eye closed at night. She still has some difficulty with speech and expressing herself. She is thick-tongued. No new neurological symptoms.

(A.R.92.) Meyer's claim relies, in large part, on the letters of Dr. Harrison, but the letters did not conclude that Meyer was disabled from the job of pharmacy technician.

Dr. Strikowsky's office note, dated October 6, 2000, showed that Meyer admitted to improvement, denied pain, and admitted to having improved tongue sensitivity and facial droop. (A.R.65.) Dr. Strikowsky's other medical records provide no evidence that Meyer was totally disabled from performing her own occupation. (A.R. 61–68.) Meyer contends that Dr. Strikowsky "advised" or "ordered" her to stop working, but the medical records provided to Hart-

ford do not support this contention. (A.R.58–72.) Dr. Taldone's office note, dated November 6, 2000, showed Meyer's vision to be within normal limits and that Meyer should use "night ointment." (A.R.84–85.) It also showed that only Meyer's right eye was affected by the paralysis. (A.R.84–85.)

The administrative record also demonstrates that Hartford's claims examiners were able to understand Meyer during telephone conversations. (A.R.176.) On March 8, 2001, Hartford claims examiner Letitia Gallman reviewed Plaintiff's medical records and observed that "while medical documentation indicates that [Plaintiff] still experiences a [right] facial droop, occasional face pain and some blurred vision medical rec[ords] in file do not support a severity of condition that would preclude primary duties [of a Pharmacy Technician]." (A.R.174.) On April 2, 2001, Hartford Claims Examiner Mary Durant ("Durant") reviewed Meyer's file and concluded that Meyer's claim should be denied because Meyer's "condition does not prevent [claimant] from perform[ing] the material and [substantial] duties of her occ[upation] on a f[ull] t[ime] basis." (A.R.174–175.) On April 3, 2001, Hartford Team Specialist Wendy Reese ("Reese") reviewed Meyer's file and agreed "that medical documentation does not support a severity of impairments that would have prevented [Plaintiff] from performing the material and substantial duties of her occ[upation] throughout and beyond the ep [elimination period]." (A.R.175.)

Hartford denied Meyer's claim by letter of Senior Examiner Durant dated April 4, 2001. (A.R.99–101.) Durant's denial letter fully set forth the basis and reasoning of Hartford's denial of Meyer's claim. (A.R.99–101.) Based on all of the available medical evidence, Durant's letter concluded that Meyer was "capable of performing [her] own occupation and [was] not 'Totally

Disabled' according to the terms of the Policy." (A.R.99.) Durant advised Meyer of her right to submit additional evidence to Hartford for consideration. (A.R.99.)

By letter dated May 14, 2001, Meyer sought reconsideration of Hartford's decision to deny her benefits. (A.R.110–114.) Even in this letter, Meyer admitted that her "speech has improved with the decrease of mouth swelling but [she] still [has] periods of [her] tongue being swollen." (A.R.112.) In support of her request for reconsideration, Meyer submitted a letter from Dr. Harrison, dated May 22, 2001 (A.R.122, 128), and an office visit note from Dr. Harrison, dated March 6, 2001 (A.R.108, 128), which had previously been considered by Hartford in making its initial denial of benefits. Far from concluding that Meyer was "totally disabled," Dr. Harrison's May 22, 2001 letter merely concluded that:

> These defects result in a cosmetic deformity of her face and secondary psychological impairment due to that. She also has difficulty communicating because of the dysarthia. She also has chronic pain and hypersensitivity in the right side of her face. The combination of these defects certainly have had a negative impact on her ability to function at her job.

(*See* A.R. 122.) On June 6, 2001, Hartford claims examiner Jane Waller reviewed the file, including the new information submitted by Meyer, and concluded that this information did not support disability. (A.R.179–180) On June 14, 2001, Hartford claims team leader, Reese, confirmed that decision, concluding "that the additional information submitted would not change our decision." (A.R. 180.) Hartford notified Meyer of its decision by letter dated June 14, 2001 (A.R.127–128.) The letter also advised Meyer of her right to an appeal and the procedure to follow if she desired an appeal. (A.R.127.)

On August 13, 2001, Meyer appealed Hartford's decision, asserting that her blurred vision, speech problems, and cosmetic disfigurements prevented her from working as a pharmacy technician. (A.R. 129–130.) Meyer's attorney submitted various medical records in support of the appeal, but most were records already considered by Hartford. (A.R.181.) The only new information was a July 6, 2001 office note from Dr. Harrison, which documented Meyer's problem keeping her right open, and a May 2, 2001 letter from Dr. Harrison, which stated:

Ann Meyer suffered a neuropathy involving a trigeminal and facial nerves. This has resulted in residual weakness of the right side of her face and difficulty with speech. She has trouble communicating with people because of these defects. These problems interfere with her working at a job requiring her to communicate verbally.

(See A.R. 137 & 139.) During the appeal, Hartford sent Meyer's medical records to an independent neurology consultant, Dr. Brian Mercer, M.D. ("Dr.Mercer"), for an independent opinion on Meyer's condition. (A.R. 146–149 & 161.) Dr. Mercer's independent review of Meyer's file consisted of a full review of Meyer's medical records as well as phone conversations with her treating physicians Drs. Harrison and Taldone. (Id.)

Dr. Mercer spoke with Dr. Harrison on November 2, 2001, and provided the following summary of their conversation:

You [Dr. Harrison] indicated that Ms. Meyer suffers from right Bell's Palsy, as well as sensory loss of the right face. Because of the Bell's Palsy, you indicated that she had some slurring of her speech of moderate severity. Although there has been slight improvement over the time that you treated her, you note that she still had significant ongoing weakness of the right face. Despite the slurring of speech, you indicated that it was not too difficult to understand her in conversation. You raised a possibility that she may have difficulty being comprehended if she was speaking rapidly. You last saw her on 9/25/2001 and indicated that she was only slightly better. With respect to work capabilities, you indicated that Ms. Meyer felt quite embarrassed by the disfigurement of her facial weakness, which has resulted in some depression. Because of her perception, you felt that she should not be employed in an occupation that required face-to-face contact with the public. However, you felt that she would be able to do work on the telephone . . . . .

(See A.R. 153.) Dr. Mercer provided Dr. Harrison with the above written summary of their conversation and stated "[i]f it is inaccurate in any way, please contact me within 15 working days. . . ." Dr. Harrison never advised that the summary was inaccurate.

Also, on November 2, 2001, Dr. Mercer spoke with Dr. Taldone. (A.R.152.) Dr. Mercer summarized his conversation with Dr. Taldone, stating, in relevant part, "[Meyer's] vision was good without correction" and that by March of 2001, "she had no functional impairment and there would be no restrictions or limitations on her work capability, work abilities from the ophthalmologic viewpoint." (Id.) Dr. Mercer gave Dr. Taldone the same opportunity, by letter, to correct any error Dr. Mercer may have made in describing their conversation. (Id.) Dr. Taldone never responded to the offer.

Dr. Mercer's independent physician review further commented on the issue of Meyer's ability to communicate effectively. (A.R.154) With respect to this issue, Dr. Mercer reported:

Although [Meyer's] residual Bell's Palsy had likely resulted in some degree of

cosmetic disfigurement, this would not be considered severe enough to impair interaction with the general public. Most individuals with Bell's Palsy can be employed in face-to-face interaction with the public without significant difficulty. There are no restrictions related to communication abilities . . .

(*See* A.R. 154.) Dr. Mercer's review also addressed Meyer's overall capacity to work in her own occupation:

> Ms. Meyer had a temporary work restriction/limitation from 9/13/00 through 12/21/00 that she could not have been employed in an occupation that required intact binocular vision. Following this, there are no restrictions or limitations on an objective basis.

(A.R.154)

Because Dr. Mercer found that Meyer could not have been employed in an occupation requiring intact binocular vision from September 13, 2000 through December 21, 2000, Hartford's Appeal Specialist, Corey M. Welch ("Welch"), received advice from Hartford's Rehabilitation Clinical Case Manager, Roger McNeely ("McNeely"), M.S., CCM, CDMS, on whether Meyer's occupation of pharmacy technician required intact binocular vision. (A.R.182.) McNeely advised Mr. Welch that loss of binocular vision would preclude depth perception, but that depth perception was not an essential physical demand of Meyer's occupation. (A.R.182.)

Based on Dr. Mercer's findings, the advice of the Rehabilitation Clinical Case Manager, and yet another review of the entire claim file, Hartford concluded that "Mrs. Meyer's medical condition has not prevented her from performing the material and substantial duties of her occupation." (A.R.160.) As a result, Hartford denied Meyer's claim for a third time by letter of Welch, dated November 26, 2001. (A.R.159–161.) This third and final denial letter provided a detailed description of Hartford's reasoning in denying Meyer's claim and advised Meyer's counsel that Hartford had completed is appeal review. (A.R.159.)

### Standard of Review

■ Summary judgment is appropriate in cases in which there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c). The court must view the record in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). In ERISA cases, the statute "does not provide the standard to review decisions of a plan administrator or fiduciary." *Shaw v. Connecticut Gen. Life Ins. Co.,* 353 F.3d 1276, 1282 (11th Cir.2003) (quoting *Marecek v. BellSouth Telecomms., Inc.,* 49 F.3d 702, 705 (11th Cir.1995)). The courts follow the directive of the United States Supreme Court set forth in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There are three standards for reviewing administrators' plan interpretations:

> (1) *de novo* where the plan does not grant the administrator discretion[;]
>
> (2) arbitrary and capricious [where] the plan grants the administrator discretion[;] and
>
> (3) heightened arbitrary and capricious where there is a conflict of interest.

*Shaw,* 353 F.3d at 1282 (citing *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001)). If the documents grant the claims administrator discretion, "then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review." *Id.*[2]

---

**2.** No distinction is drawn between law and fact in choosing the standard of review for

denial of ERISA benefits. *See Shaw,* 353 F.3d

 "Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" *HCA Health Servs.*, 240 F.3d at 993. An administrator's decision is deemed "wrong" when the court disagrees with the claims administrator's plan interpretation after a *de novo* review of the plan documents and disputed terms. *Id.* at n. 23. If the court disagrees with the decision and thus, finds it "wrong," then the court next decides whether "the claimant has proposed a 'reasonable' interpretation of the plan." *Id.* at 994 (quoting *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir.1994)).

 Even if the claimant's proposed interpretation is reasonable, the court must still determine whether the claims administrator's "wrong" interpretation is reasonable. At this point, the court must gauge the self interest of the claims administrator. *See HCA Health Servs.*, 240 F.3d at 994. If there is no conflict of interest, then the inquiry stops, and the review is arbitrary and capricious. *Id.* If a conflict does exist, then the heightened arbitrary and capricious review must be invoked. *Id.*

 Under the heightened standard of review, "the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." *HCA Health Servs.*, 240 F.3d at 994. The claims administrator satisfies this burden by showing that its "wrong but reasonable" plan benefits the class of participants and beneficiaries. *Id.* at 995. Even if the claims administrator accom-

plishes this task, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious." *Id.* If it cannot be shown that the participants and beneficiaries of the plan are benefited, then the claims administrator's plan interpretation is not entitled to deference.

### *Discussion*

 The Plan documents in this case unequivocally grant Hartford the discretion and authority to determine all benefit claims and appeals and to construe and interpret the terms and provisions of the policy. The Plan clearly provides Hartford with discretionary authority, stating, "[t]he Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."[3] (Dkt. 12, ex. A, SPD CERT. 14, 26–28, & 38–39.) However, when the administrator making the benefit decision is also the insurance company responsible for paying claims, as is Hartford in this case, the heightened arbitrary and capricious standard is applicable due to possible conflict of interest. *See Brown v. Blue Cross/Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1563–64 (11th Cir.1990). At the outset, this court must conduct a *de novo* review of the record and the policy to determine whether the interpretation was "wrong" as that term is defined by case law in this circuit. If this Court determines that the interpretation was not "wrong," then it is unnecessary to explore all the details of the particular conflict of interest. *See HCA Health Servs.*, 240 F.3d at 993–94 (citing *Marecek*, 49 F.3d at 705).

at 1285 (citing *Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir.2003)).

**3.** District courts have recently held that this discretionary language found in the Booklet–Certificate is part of the Plan, and is a suffi-

cient delegation of discretionary authority to trigger deferential review. *McLeod v. Hartford Life and Accident, Ins. Co.*, 247 F.Supp.2d 650, 654 (E.D.Pa.2003); *Kazazian v. Finlay Fine Jewelry Corporation*, 2003 WL 22594439, at *1 (D.Mass. Nov. 10, 2003).

■ Based on a *de novo* review of the administrative record which was before Hartford, this Court cannot find that Hartford's decision to deny LTD benefits to Meyer was "wrong." The administrative record in this case includes substantial evidence supporting denial of Meyer's benefits. For example, Hartford's decision is supported by the opinion of Dr. Mercer, an independent neurology consultant who, after reviewing Meyer's claim file and speaking to Meyer's treating physicians, Drs. Taldone and Harrison, concluded that Meyer was not disabled. (A.R.161, 149–146.) Dr. Taldone had found that by March 2001 (during the Plan "elimination period"), from an ophthalmologic perspective, Meyer had no functional impairment and there would be no restrictions or limitations on her work capability, work abilities . . . ." (A.R.152.) And while Dr. Harrison noted some limitation with speech, he found that he could understand Meyer. (A.R.153.) Hartford's claims examiners were also able to understand Meyer in numerous telephone conversations. (A.R. 172–176.) Also, while Meyer complained that she could not drive, the record showed that she spent substantial time in Buffalo, New York, where she was able to care for her ill sister. (A.R. 42, 80, & 172–173.)

The administrative record shows that Hartford's independent neurology consultant, Dr. Mercer, directly acknowledged the opinions of Meyer's treating physicians and took all of those opinions into account when forming is own opinion on Meyer's condition.[4] (A.R.155.) Even if the medical evidence from Meyer's treating physi-cians did support Meyer's alleged disability, Hartford would not have been required to defer to those opinions. The Supreme Court, in *Black & Decker Disability Plan v. Nord.* 538 U.S. 822, 123 S.Ct. 1965, 1970, 155 L.Ed.2d 1034 (2003), held that "[n]othing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." As such, the Court finds that the administrator's claim decision was not wrong and there is no need for further analysis under the heightened arbitrary and capricious standard of review.

■ However, even if the Court could disagree with the claims administrator's decision in this case in some way, Hartford must still prevail under the heightened review standard. The Court must give great deference to the discretion afforded the claims administrator under the terms of the Plan. *See Health Servs. of Georgia,* 240 F.3d at 994. Only after a determination is made that the claims decision was wrong does the court gauge the self-interest of the administrator. *Id.* Here, Hartford has an easy task of meeting its burden of showing that its "wrong but reasonable" plan interpretation benefits the class of participants and beneficiaries. The financial conflict here is relatively small, as the claims decision under review affect one claimant only, and there is no evidence whatsoever of bad faith in the administrative record. As previously discussed, the record reflects that Hart-

---

4. Meyer asserts that Dr. Mercer must be viewed as a biased in-house reviewer because Hartford uses Dr. Mercer and his employing company, UDC, to handle all of its medical reviews on appeals. Meyer also challenges the veracity of Dr. Mercer's reports of conversations he had with Meyer's treating physicians. These assertions and challenges should be dismissed as unsupported and conclusory, especially in light of Meyer's failure to depose Dr. Mercer and UDC's President after receiving this Court's express ruling allowing said depositions to be conducted. Further, Meyer points to no authority barring a claims administrator from using its own employees to perform medical reviews.

ford relied on a substantial evidence in making its benefits decision, including evidence from Meyer's own treating physicians, from Meyer's own communications with Hartford, from Hartford's Rehabilitation Clinical Case Manager, and from an Independent Neurology Consultant. Further, depositions in this case established that the alleged conflict of interest is minimal. (*See* dkt. 29, ex. C, Deposition of Annette Moore, pp. 22–25.) It is obvious to this Court that it serves the benefit of the class of all participants and beneficiaries of the Plan when claims for LTD benefits are denied to employees who are able to return to work. Here, the claims administrator made a decision to deny Meyer benefits after a thorough review of ample medical evidence in the administrative record that Meyer was not "totally disabled." Meyer fails to sufficiently demonstrate that the decision was in any way arbitrary and capricious. This Court finds no reason why the decision of the administrator should not be upheld.

**ACCORDINGLY,** it is **ORDERED AND ADJUDGED:**

1. Defendant's Motion for Summary Judgment (dkt.20) is **granted.**

2. Plaintiff's Motion for Summary Judgment (dkt.27) is **denied.**

3. The Clerk is directed to enter final summary judgment in favor of Defendant and against Plaintiff on all claims.

4. The Clerk is directed to close this file.