Robert RIDGE, Plaintiff,

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,**
Defendant.

No. 8:03–CV–1871–T–26EAJ.

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 12, 2004.

---

John V. Tucker, Anderson & Tucker, St. Petersburg, FL, for Plaintiff.

Ralph C. Losey, Stephanie A. Segalini, Katz, Kutter, Alderman & Bryant, P.A., Orlando, FL, for Defendant.

## ORDER

LAZZARA, District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Dkt.20), Defendant's Statement of Undisputed Facts (Dkt.23), Hartford's Affidavit in Support (Dkt.22), Plaintiff's Statement of Disputed Facts in Opposition (Dkt.30), Plaintiff's Memorandum in Opposition (Dkt.31), Plaintiff's Dispositive Motion for Summary Judgment (Dkt.24), Plaintiff's Statement of Undisputed Facts (Dkt.25), Defendant's Legal Memorandum in Opposition (Dkt.28), and Hartford's Affidavit in Opposition. (Dkt.29). After careful consideration of the applicable law and the entire file, the Court concludes that Plaintiff's Dispositive Motion for Summary Judgment (Dkt.24) should be granted, and Defendant's Motion for Summary Judgment (Dkt.20) should be denied.

## BACKGROUND

This is an action brought by an employee of Raymond James Financial Inc. (Raymond James) pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) based on the denial of his long-term disability (LTD) benefits. Plaintiff Robert Ridge was an eligible participant in Raymond James' Group Long Term Disability Income Protection Plan (the Plan), which was issued by The Hartford (Hartford) to Raymond James. (Dkt.1, Exh. A). The Hartford (Hartford) underwrote and insured the long-term disability insurance coverage under the Plan, as well as basic life and supplemental life insurance coverage.

*Medical and Work History*

Plaintiff worked for Raymond James as an over-the-counter (OTC) trader beginning in February 1986. In 1996, Plaintiff began experiencing numbness and weakness in his arms and neck as well as pain in his back. (Dkt. 22, Exh. A at 0456). Plaintiff underwent a lumbar bilateral laminectomy on February 3, 1999. (Dkt. 22, Exh. A at 0456, 0310). In July 1999, Plaintiff had neck surgery, specifically an osteophectomy, vertebral carpectomy, and diskectomy and fusion. (Dkt. 22, Exh. A at 0456, 0310–0311). Plaintiff's last day at work, however, was July 20, 1999, and Plaintiff's LTD benefits became effective October 19, 1999.[1] (Dkt.1, Exh. C). He ceased work due to cervical and lumbar stenosis.

In August 1999, Dr. Casey Gaines, Plaintiff's neurosurgeon, performed a second surgery for the cervical spine. (Dkt. 22, Exh. A at 0456, 0310). On March 23, 2000, Dr. Gaines performed a third operation on Plaintiff's cervical spine, a C5–6 bilateral laminectomy. (Dkt. 22, Exh. A at 0311). Plaintiff continued to see Dr. Gaines until Dr. Gaines informed him that there was nothing more surgically that could be done for Plaintiff. In April 2001, Dr. Gaines completed a physical capacities

---

1. Plaintiff began receiving Primary Social Security Disability benefits January 2000. (Dkt.1, Exh. D).

evaluation which stated Plaintiff could work only two hours out of an eight-hour day. (Dkt. 22, Exh. A at 0005, 0139).

Plaintiff had been seeing Dr. David Hobbs, Plaintiff's family practitioner, since January 1999. Dr. Hobbs' primary diagnosis for Plaintiff on July 16, 2001, was recurrent spinal and cervical stenosis. In making his diagnosis, Dr. Hobbs referred to the records of Dr. Gaines. According to Dr. Hobbs, Plaintiff's prognosis was unchanged and retrogressed. As part of Plaintiff's many limitations, Dr. Hobbs noted that Plaintiff was unable to use the keyboard, repetitive hand motion. Dr. Hobbs opined that Plaintiff's various limitations would last indefinitely.

Hartford requested that Plaintiff undergo an Independent Medical Examination (IME) with Dr. David H. Baras, a physiatrist, in January 2002. On January 30, 2002, Dr. Baras issued his initial report. (Dkt. 22, Exh. A at 0309–0316). Dr. Baras recommended that Plaintiff undergo a work hardening evaluation assessment due to the multiple number of surgeries Plaintiff underwent. (Id. at 0315). He stated that after he performed the work hardening evaluation, Plaintiff "may be able to return to some form of employment, but my general feeling will be that even at a sedentary employment status, he will have limitations in time as far as how long he can perform activities and will require rest periods." (Id.).

On February 7, 2002, Dr. Baras issued an addendum to his initial report after viewing the surveillance tape. (Dkt. 22, Exh. A at 0306–0307). Dr. Baras noted that while he was capable of performing work on his motor home and therefore doing some manual physical work, he could not ascertain from watching the tape whether Plaintiff suffered any repercussions that night or the next day. (Id.). Watching the tape did not alter Dr. Baras'

initial assessment, because he noted that the tape could not be likened to an eight-hour work day. (Id.). Although he stated that Plaintiff was "employable" for "a sedentary to light work status with intermittent breaks," Dr. Baras would not release him to work until Plaintiff underwent a work hardening program. (Id.).

On May 10, 2002, a registered nurse employed by Hartford as a case manager sent Dr. Hobbs, Plaintiff's family physician, a facsimile stating that Hartford would like to have Plaintiff undergo an FCE and requesting a prescription for the test from Dr. Hobbs. (Dkt. 22, Exh. A at 0289). The nurse case manager wrote that if Dr. Hobbs chose not to prescribe an FCE, then Hartford requested that he state why and provide them with testing or a written statement supporting Plaintiff's lack of function. (Dkt. 22, Exh. A at 0289). Dr. Hobbs apparently provided Hartford with a prescription for an FCE in response to this facsimile. Plaintiff was unaware that Hartford had contacted Dr. Hobbs.

Although Hartford scheduled an FCE, Plaintiff, in advance, refused to attend. (Dkt. 22, Exh. A at 0240–0244). Plaintiff had asked for confirmation that a medical doctor would perform the FCE and that the FCE could be safely and properly conducted. (Dkt. 22, Exh. A at 0249–0250). When the assurances did not come, Plaintiff refused to undergo the FCE. (Dkt. 22, Exh. A at 0240–0244).

On August 30, 2002, Dr. Gaines, the neurosurgeon, clarified his interpretation of a physical capacity evaluation form filled out by Plaintiff in April 2001. (Dkt. 22, Exh. A at 0139). Dr. Gaines wrote that in his opinion, Plaintiff, in an eight-hour day, "could sit for two hours, stand for one hour, walk for one hour or drive for two hours." (Id.). On February 25, 2003, Dr. Gaines wrote that Plaintiff's diagnosis was cervical myelopathy "that causes ongoing

inability to use his hands and a dysesthesia in his hands." (Dkt. 22, Exh. A at 0112). He declared that Plaintiff's spinal cord was permanently bruised. (*Id.*). He opined that Plaintiff will continue to have problems and is unable "to use his hands in an office type setting." (*Id.*). He confirmed that there was no treatment for Plaintiff's condition. (*Id.*).

*Terms of the Plan*

The Certificate of Insurance certifies that it and the pages following the certificate "will become your Booklet–Certificate," which is "a part of the Policy." (Dkt. 1, Exh. B at pg. 2). Under the terms of the Booklet Certificate, "Totally Disabled" is defined as follows:

(1) during the Elimination Period; and

(2) for the next 24 months,

you are prevented by Disability from doing all the material and substantial duties of your own occupation. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by:

(1) training;

(2) education; or

(3) experience.

(Dkt. 1, Exh. B at pg. 4). "Disability" is defined as "any accidental bodily injury, sickness, or pregnancy." (Dkt. 1, Exh. B at pg. 7).

The Plan Administrator is designated as Raymond James. (Dkt. 1, Exh. B at pg. 31). As one of the general provisions, the Booklet Certificate provides that Hartford "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Dkt. 1, Exh. B at pg. 3). Under the "Claims" section, it is clear that Hartford serves as the claims administrator under the Plan.

Under the "Benefits" portion of the Booklet Certificate, Hartford has the right to cease benefit payment on the first of the following to occur:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof that you are continuously Disabled;

(3) *the date you refuse to be examined, if the Hartford requires an examination;*

(4) the date you die; or

(5) the date determined from the table below.

(Dkt. 1, Exh. B at pg. 15) (Emphasis added). Hartford has the right to a "physical examination" to "have you examined to determine if you are Disabled." (Dkt. 1, Exh. B at pg. 29). "Examination" also appears in the Plan's definition of "medical care" which is care received when one of the following occurs:

(1) a Physician is consulted or medical advice is given; or

(2) treatment is recommended or prescribed by, or received from a Physician.

Treatment, as used above, includes, but is not limited to:

(1) any medical examinations, tests, attendance or observation;

(2) any medical services, supplies or equipment, including their prescription or use; or

(3) any prescribed drugs or medicines, including their prescription or use.

(Dkt. 1, Exh. B at pg. 8). "Physician" is defined under the Plan as "a legally qualified physician who is practicing within the scope of his license." (Dkt. 1, Exh. B at pg. 8).

*Termination of Benefits*

Plaintiff received benefits under the "own" occupation provision of the Plan until June 30, 2002. On July 23, 2002, Hart-

ford terminated Plaintiff's LTD benefits under the "any" occupation provision, effective June 30, 2002. (Dkt. 22, Exh. A at 0153–0162). The letter of termination of benefits provides in pertinent part:

The Attending Physician Statement Dr. Hobbs completed on 7/16/2001 stated that [Plaintiff's] primary diagnosis is recurrent spinal stenosis, cervical. In reference to treatment information, Dr. Hobbs stated we refer to Dr. Gaines' records. Dr. Hobbs stated that [Plaintiff's] prognosis was unchanged and retrogressed. He stated [Plaintiff] has the capacity to stand two hours at a time, walk one hour at a time, sit for two hours, lift/carry twenty-five pounds max, is unable to reach/work overhead, can push/pull minimal, drive two hours maximum, is unable to use the keyboard/repetitive hand motion. Dr. Hobbs felt these limitations would last indefinite.

. . . .

[Plaintiff] completed a Claimant Questionnaire on 4/30/2001 and described his condition as numbness in hands and arm, spasms in legs, cramps in calves and shoulder which limits accuracy with hands and time in any position to 2 hours to 4 hours total a day. He stated that he has experienced more stiffness in his joints and muscles in the last 18 months. He stated his activities during a typical day would be at 7 am a 12 step meeting, breakfast at home, read newspaper, rest, 10 am physical therapy, 1 hour gym or 45 minute walk, lunch, nap, plan 2–3 hours of maintenance work, wash car, grocery shop, clean, hot tub, rest, and watch the 6:00 news. He stated the physicians he had consulted or been treated by within the last 18 months were Dr. Gaines and Dr. Hobbs. Video surveillance was conducted to document his level of activities during the period of 7/25/2001, 7/26/2001 and 7/27/2001. He was observed driving a vehicle, which appeared to be a standard transmission, entering/exiting a vehicle, shopping, carrying packages, unlocking vehicle door, working on a motor home, twisting/turning body while under a motor home, working inside a motor home, and working on an engine of a motor home. It appeared [Plaintiff] was jacking the rear end of a motor home, while working on the rear tires. He did not display any numbness in his hands and appeared to have control of the tools in his hands. [Plaintiff's] accuracy with his hands did not appear to be impaired and he appeared to have normal range of motion.

In order to resolve the discrepancies in [Plaintiff's] demonstrated activities and level of functionality as observed in the video surveillance with what was previously described on his Claimant Questionnaire and the Attending Physician Statement completed by Dr. Hobbs, an interview was scheduled with [Plaintiff] on 8/30/2001 with The Hartford's Investigator, William Moryto. Prior to this appointment we telephoned [Plaintiff] on 8/02/2001 and he advised us that he was presently in his motor home and driving to Michigan for a high school class reunion. He stated that he was driving alone and was having difficulty doing so, but was determined to make it to the reunion. He stated he was driving a couple of hours and then resting and was averaging 200 miles daily. He stated he would be back possibly at the end of August.

In the course of the interview on 8/30/2001, [Plaintiff] described the history of his condition and his treatment with Dr. Gaines and Dr. Hobbs. He stated the thumb and index finger of the right hand are pretty much numb all of the time and there isn't much feeling or control in them. He stated the little and

next finger of the left hand are about the same. He stated his right arm will go numb when he sits in front of his computer for about a couple of hours. He stated what this culminates in is a total knotting up of his right shoulder where he cannot do anything. He stated the only thing that he can do is to lie flat on his back for awhile until it works out. He stated he gets cramps in his extremities frequently. One day he will be fine, and the next day he won't be able to do anything. The cramping will cause him to have no sleep or disrupted sleep.... [Plaintiff] stated that he is probably worse now than a year ago. He is having trouble daily with his legs and lower back pain. [Plaintiff] stated that he has not been treated by Dr. Gaines in about ten months to a year as he advised [Plaintiff] that there was nothing more he could do for him surgically. His current Physician is his Primary Care Physician, Dr. Hobbs. He was last treated about five weeks ago....

He stated he could "stump" around the computers with bad fingers. He cannot sit at a desk long enough to do the job. He stated he could not do the job with the accuracy and speed necessary, which is due to the cervical nerve damage causing the numbness in his fingers, right arm and the cramping of the right shoulder. He stated that he did not feel he was capable of returning to work at any occupation as his dependability would be a problem. He drops things all the time and avoids glass containers. [Plaintiff] felt this would be a liability in any type of job. He stated if he limits himself to a couple of hours a day of limited activity he can get by. He stated he was still recovering from the recent drive from Michigan. He is taking Relafen and stated it will be about another week before he is able to walk

correctly and feel better. He stated that he believed his SEC license had expired as there is a two year limit on his license....

On 1/23/02 [Plaintiff] was examined by an Independent Medical Examiner, Dr. David Baras with Elite Physicians. Dr. Baras stated in his report that [Plaintiff] attended the Independent Medical Evaluation with his wife. [Plaintiff] handed Dr. Baras a two-page typed outline, as [Plaintiff] called it, a summary of events, along with a physical status for [Plaintiff] as of 1/16/2002, one column of symptoms, one column of results, and a typed page of present medications. Dr. Baras stated in the report that his impression was "1) Status post cervical spine surgery times three with still resultant dysesthesia of the right upper extremity, especially the shoulder girdle, right side, on prolonged activity; however, the neurological exam is normal. 2) There is still evidence of significant degenerative changes of the cervical spine and lumbar spine with continued evidence of stenosis and neuroforaminal narrowing in both the cervical and lumbar spine with osteophytes, degenerative disc changes but, again, no neurological findings on today's examination. 3) Previous bilateral laminectomy at L2 through S1 of the lumbar spine in February of 1999 with residual discomfort."

Dr. Baras stated, "...The surveillance investigation, especially specific events like working on his recreational vehicle and carrying items in his right upper extremity, shows the ability for him to be in awkward positions and use both upper extremities to do activities. The patient readily admits that he has spent one day doing several hours of work on his recreational vehicle and preparing it for a trip and states, however, that he was in significant pain afterward requir-

ing medication and rest. . . . I would recommend a work hardening evaluation to adequately and specifically give us information on frequency of performing activities such as lifting, pushing, pulling, carrying, and handling using his upper extremities and lower extremities. . . .

. . . It may be, in fact, that after performing the work hardening evaluation, that he may be able to return to some form of employment, but my general feeling will be that even at a sedentary employment status, he will have limitations in time as far as how long he can perform activities and will require rest periods. . . ."

Dr. Baras completed a Physical Capacities Evaluation form stating that [Plaintiff] in his opinion has the capability to sit and stand for 2–4 hours at a time for a total of 8 hours; walk 2 hours at a time for a total of 8 hours; drive 1 hour at a time for a total of 4 hours per day; lift/carry from 1–10 pounds constantly and 21–50 occasionally; push/pull 1–20 pounds constantly and 21–50 pounds occasionally; climb, balance, stoop, kneel, crouch, and crawl occasionally; reach above shoulder, reach at waist level, reach below waist level frequently; handle, finger and feel frequently; and use feet and hands for repetitive use. . . .

On 2/07/2002 an Addendum was submitted from Dr. Baras in regards to his assessment after reviewing the surveillance video. He stated, "After carefully reviewing the video surveillance tape of [Plaintiff], he did not demonstrate any physical limitations in using his hands, feet, legs, or trunk. The only limitation I could appreciate was a decrease in range of motion of his cervical spine, specifically when turning his head either right or left or bringing his head backwards into extension there appears to be some mild limitations. . . ."

On 5/14/2002 Dr. Hobbs wrote a prescription to allow [Plaintiff] to undergo a Functional Capacities Evaluation.

. . . we advised you that failure to attend the [FCE] or invalid results due to submaximal effort would result in immediate termination of [Plaintiff's] LTD benefits.

. . . .

We . . . enclosed a copy of the policy booklet for Raymond James Financial, Inc.. We again advised you of the provisions of the policy and referred you to page 15, Article 1., Benefit Payment Due to Disability, which states:

"The Hartford will cease benefit payment on the first to occur of:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof that you are continuously Disabled;

(3) the date you refuse to be examined, if The Hartford requires an examination;

(4) the date you die; or

(5) the date determined from the table below."

In order to accommodate your request to have the FCE videotaped we rescheduled the FCE for 7/02/2002 at 9 a.m. On 7/01/2002 you faxed us a letter stating that your client will not be attending the FCE. . . . As we stated in our letter dated 7/10/2002, we believe that a FCE is an appropriate method for conducting a physical examination of [Plaintiff] for the purposes of clarifying any Disability.

. . . .

. . . In the course of our investigation, [Plaintiff] has demonstrated that he has the residual capacity to return to some type of employment. The medical documentation that has been provided to The Hartford is unsatisfactory and does not clearly support continued disability. We attempted to obtain a FCE as Dr. Baras had recommended and Dr. Hobbs had

prescribed. Per your letter dated 7/01/2002 you have refused [Plaintiff] to undergo a FCE. We have advised you in several of our letters that benefits would cease if [Plaintiff] refused to be examined. Accordingly, no benefits are payable to [Plaintiff] beyond 6/30/2002 and [Plaintiff's] claim is terminated.

(Dkt. 22, Exh. A at 0153–0162).

*Appeal of Denial of Benefits*

On June 20, 2003, Hartford wrote the following letter affirming the denial of Plaintiff's LTD claim:

> I have ... concluded that our decision to terminate benefits was based on [Plaintiff's] failure to attend the Functional Capacity Evaluation. Accordingly, the Policy states that benefits cease.
>
> . . . .
>
> As part of our ongoing review, we had conducted some surveillance activities during July 2001. [Plaintiff] was observed working on and under his motor home from approximately 10:45 a.m. to 5:00 p.m. He performed some maintenance functions for several hours, with intermittent breaks to refer to instructions, obtain tools or other equipment. The video shows he was able [to] lay on his back, twist his body, drop to his knees, push his body weight with his feet and use tools with no evidence of pain, discomfort, or limitations of his hands, arms, legs, wrists, fingers or knees. He was physically capable of performing manual physical activity throughout the day.
>
> Previously, in April 2001, [Plaintiff] reported to us that he had numbness in his hands and arms with cramps in his calves and shoulder due to cervical and lumbar stenosis. He said his condition limited accuracy with his hands in any position to two hours at a time, and to a maximum of four hours total during a day. Because of apparent inconsistencies between his statement and his activities recorded on the video, we arranged a personal interview by one of our company representatives in August 2001. During that meeting, [Plaintiff] reported that he went to the gym to work out or he walked in the mornings and he might tinker on his motor home in the afternoon performing light carpentry, interior cleaning and painting. He said he was no longer able to sail. He said he was able to drive, wash his car, work with potted plants, grocery shop and run family type errands. He said he was unable to work due to cervical nerve damage which caused numbness in his fingers and right arm, and cramping in his right shoulder. He said he frequently dropped things. He reported having taken a vacation to Michigan for about 24 days to attend a class reunion between the time of our surveillance and the date of the interview. He said he drove his motor home from Florida to Michigan over a period of seven days by alternating driving and resting periods. He averaged about 200 miles daily. He said he is able to get by limiting his activities to a couple of hours daily. If he is more active, he will increase his medication, Relafen, until he feels better.
>
> Following the surveillance and the interview, we were still unclear concerning [Plaintiff's] reported physical limits and abilities and his actual activities. In an effort to address the differences, we exercised our contractual right to have him independently examined as provided in the insurance Policy. Dr. David Baras, a Board Certified Physical Medicine and Rehabilitation Specialist, performed an independent medical examination on January 23, 2002.
>
> Dr. Baras reviewed the medical documentation we provide to him from our

file, obtained [Plaintiff's] medical history and conducted a physical exam. He also reviewed the videotape from our surveillance. On physical examination, he noted [Plaintiff] was not in any acute distress. He demonstrated full range of motion of the shoulder girdle muscles with pain. He showed very limited range of motion of the cervical spine in all directions with pain on motion, especially lateral bending and cervical motion to both sides. His muscle mass was equal and symmetrical for both upper and lower extremities with good muscle bulk. He had well-healed surgical scars over the cervical and lumbar spine posteriorly, and also the interior cervical spine by his neck. He demonstrated good range of motion of the lumbar spine with pain complaints ongoing from a flexed over position to a standing position. Muscle mass was symmetrical. He was able to walk on heels and toes without difficulty; stance and gait were normal. Lying on his back, straight leg raising was negative bilaterally. He was able to lift both legs up at the same time for a few seconds without any back pain or referred pain. He demonstrated equal and symmetrical muscle mass in upper and lower extremities. Sitting up, he demonstrated normal strength of the upper extremity and reported sensory deficits primarily in the thumb and index finger and at times in the little finger of the right hand. He had 2+ reflexes for biceps and triceps with no pathological reflexes symmetrically. He demonstrated normal strength and sensation. He had negative Tinel's sign over the wrist and negative sensation or pain on compressing the ulnar nerve at the median elbow.

Dr. Baras' impression was: 1–status post cervical spine surgery times three with still resultant dysesthesia of the right upper extremity subjectively with chronic pain complaints, especially the right shoulder girdle, on prolonged activity despite a normal neurological exam; 2–evidence of significant degenerative changes of the cervical and lumbar spine with continued evidence of stenosis and neuroforaminal narrowing with osteophytes, degenerative disc changes, but no neurological finding on exam; 3–previous bilateral laminectomy at L2 through S1 in 2/99 with residual discomfort.

After reviewing the surveillance video of [Plaintiff] working for several hours during 7/01 performing maintenance on his motor home, Dr. Baras stated it was clear that he was capable of performing manual activities and he believed he was employable. He was unsure [i]f [Plaintiff] suffered any repercussions from his activity in the evening or the next day. He felt [Plaintiff] was capable of performing sedentary to light work with intermittent breaks, allowing him to stand and sit as needed. Dr. Baras said [Plaintiff] needed a work hardening program before returning to work.

In order to further objectify [Plaintiff's] functional limits and abilities, we arranged for a Functional Capacity Evaluation (FCE) on June 11, 2002. On June 18, 2002 we notified you in writing of the Policy language concerning this type of examination and of the ramifications should [Plaintiff] fail to attend. The Policy states that "The Hartford will cease benefits payment on the first to occur of . . . (3) the date you refuse to be examined, if The Hartford requires an examination." You notified us on July 11, 2002 that [Plaintiff] would not attend the FCE. Consequently, [Plaintiff] breached the terms of the insurance contract and Hartford terminated Long Term Disability benefits after 6/30/02.

I respectfully disagree, in part, with Ms. Staz's 7/23/02 conclusion concerning [Plaintiff's] Disability. She stated he was no longer Disabled as defined by the Policy. It is my conclusion that we were unable to reach a decision on Disability without the results of the FCE as we were unable to establish [Plaintiff] was capable of performing the functions of his previous work or any other work for which he was or could become qualified, considering his previous training, education or experience.

(Dkt. 22, Exh. A at 0046–0048). The letter further noted that Hartford did not review or consider the results of a vocational assessment performed in April 2003, because it was not relevant to the decision. (*Id.* at 0048).

## STANDARD OF REVIEW

Summary judgment is appropriate in cases in which there is no genuine issue of material fact. See Fed.R.Civ.P. 56(c). The latest statement on the standard of review for ERISA cases is found in *Williams v. BellSouth Telecommunications, Inc.,* 373 F.3d 1132 (11th Cir.2004). Noting that ERISA provides no standard for reviewing decisions of plan, or claim, administrators or fiduciaries, the Eleventh Circuit reiterated the three distinct standards for reviewing administrators' plan decisions set forth in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989):

(1) de novo where the plan does not grant the administrator discretion [i.e., does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan

grants the administrator such discretion but] ... [he has] ... a conflict of interest.

*Williams,* 373 F.3d at 1134–35 (citing *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001) and *Shaw v. Connecticut Gen. Life Ins. Co.,* 353 F.3d 1276, 1282 (11th Cir.2003)).[2] Further clarifying the standard of review, the *Williams* court simplified the multi-step approach into six steps to be applied in reviewing *all* ERISA-plan benefit denials:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); [footnote omitted] if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," [footnote omitted] then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he *was* vested with discretion in reviewing claims, then determine whether " reasonable" grounds [footnote omitted] supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

---

**2.** Courts apply these three levels of review "to both plan interpretations and factual determi-

nations." *Williams,* 373 F.3d at 1134 n. 3.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams,* 373 F.3d at 1137–38.

## DISCUSSION

Applying the de novo standard to Hartford's decision, the Court disagrees with the denial of LTD benefits,[3] based on the record as it stood before the claims administrator. Thus, for the reasons set forth below under section I, the administrator's interpretation of the plan was "wrong" as that term is defined by case law in this circuit. Proceeding to the next step and as this Court has already ruled in prior cases, the Court finds that the Plan documents in this case grant Hartford the discretion and authority to determine all benefit claims and appeals and to construe and interpret the terms and provisions of the policy, which includes the Certificate Booklet. *See Meyer v. Hartford Life and Accident Ins. Co.,* 320 F.Supp.2d 1256 (M.D.Fla.2004). Because Hartford, as claims administrator, is also the insurance company responsible for paying the claims, the heightened arbitrary and capricious standard is applicable due to a possible conflict of interest. *See Brown v. Blue Cross/Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1563–64 (11th Cir.1990).

Having found that Hartford's decision is "de novo wrong" and that Hartford *was* vested with discretion in reviewing claims, the Court must next determine whether "reasonable" grounds supported the decision by applying the more deferential arbitrary and capricious standard. For the reasons set forth below in section II, the Court finds that Hartford's reasons in this particular case were unreasonable. Because reasonable grounds do not exist, there is no need to determine whether Hartford operated under a conflict of interest.[4]

## I. Hartford's Interpretation as Wrong

### A. *First Denial of Benefits*

■ The first letter of denial of benefits from Hartford provides that benefits were denied based on Plaintiff's refusal to submit to the FCE. In the initial denial, Hartford relied on a surveillance tape, an interview, Dr. Baras' report, and the materials from the two treating physicians, Dr. Hobbs and Dr. Gaines.

*The Surveillance Report and Videotape*

Hartford had Plaintiff surveilled for three days in July 2001.[5] For the first two days there was very little activity on the part of Plaintiff—he took a short drive. On the third day, however, Plaintiff spent a little over six hours moving about and working on his motor home. He spent time inside as well as outside the motor home. It is impossible to discern, however, exactly what Plaintiff was doing inside the motor home, other than intermittently walking a little and perhaps sitting behind the wheel. The video shows Plaintiff scooting his upper body underneath the motor home on his back, leaving his legs sometimes bent and sometimes stretched

---

3. The parties agree that the Court's ruling on the termination of LTD benefits also governs Hartford's termination of life insurance premium waiver benefits.

4. Another judge in the Middle District has analyzed Hartford's self-interest in a different case involving a heavily fact-laden inquiry as opposed to an inquiry of pure plan interpretation. *See Barchus v. Hartford Life and Accident Ins. Co.,* 320 F.Supp.2d 1266 (2004). In *Barchus,* the court found that under the facts of that case, Hartford's self-interest did not play a significant role in the denial of benefits.

5. This Court has viewed the surveillance tape, which lasts over six hours, as did Dr. Baras.

out clear of the motor home. At the times he was underneath the motor home, he faced the sky, or the underside of the motor home.

The video did not reveal any precise arm movements. At one point, Plaintiff was seen working near the rear tires of the motor home with a long bar. Suffice it to say that while the video showed Plaintiff repairing or mending, or perhaps just tinkering with, the motor home, it was not at all obvious what the Plaintiff was actually doing with the vehicle, nor was it ascertainable whether he had normal control of his hand movements or whether he felt numbness in his extremities. The tape is simply not proof, standing alone, that Plaintiff is not disabled, as Dr. Baras as much as admitted in his report.

### The Interview

On August 30, 2001, a Hartford investigator, William Moryto, interviewed Plaintiff. Plaintiff stated he could not return to work because he could no longer manipulate five computers at once to trade accurately and quickly enough to be an effective trader. In the interview, Plaintiff discussed that he had driven his motor home to and from Michigan to attend his high school reunion during the month of August 2001. Plaintiff, however, drove no more than two hours at a time and averaged no more than 200 miles per day.

### The Physicians' Findings

It is irrefutable that Plaintiff has never been released to work by any of the three physicians who examined him. Neither Dr. Hobbs, his family physician, nor Dr. Gaines, a neurosurgeon, ever released Plaintiff to work. Dr. Hobbs made an independent determination that Plaintiff could not work an eight-hour day as did Dr. Gaines. Essentially their findings revealed that Plaintiff could sit for two hours, walk for one hour and stand for either one or two hours, confirming that Plaintiff could not return to work at any occupation. Dr. Gaines noted that the bruising of Plaintiff's spinal cord was permanent, as was the inability to use his hands and the suffering from a dysesthesia in his hands.

Even Dr. Baras, the physiatrist who conducted the IME for Hartford, never released Plaintiff to work or made a definite determination as to what and how much Plaintiff could perform in an eight-hour work day. He suggested that an eight-hour work day be simulated and recommended that Plaintiff undergo a work hardening program before it could be determined that he could in fact return to work at any occupation. Dr. Baras recognized that although Plaintiff had moved around, not continuously, for over six hours on one particular day, there was no evidence that he did not suffer pain afterwards or numbness during the activities.[6]

### B. Termination Upheld on Appeal

█ The final letter from Hartford denying benefits clarified that the sole reason benefits were denied was Plaintiff's refusal to submit to an FCE. Hartford interpreted the terms of the Plan to permit a denial of benefits if Plaintiff refused to submit to an FCE. Hartford admitted that there never had been a determination that Plaintiff was totally disabled from any occupation.

█ The terms of the Plan do permit Hartford to request an "examination." Plaintiff argues that the word "examination" necessarily means that it is to be

---

**6.** For the two prior days of surveillance, Plaintiff's activities were minimal, leaving the

house perhaps once a day.

performed by a medical doctor. An "examination" is not defined by the Plan, however. The term "examination" appears under the medical care section of the Plan as part of the definition of treatment as a "medical examination." If a term such as "examination" is not defined in the Plan, general rules of construction require that this Court construe any ambiguities against the drafter, which is Hartford. *See Jones v. American Gen. Life and Accident Ins. Co.*, 370 F.3d 1065, 1070 (11th Cir.2004); *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207–08 (11th Cir. 2003); *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir.1994).

The Court does not interpret the terms of the Plan to permit denial of benefits based solely on the refusal to submit to an FCE under the particular facts of this case. Nothing in the Plan defines an FCE, and nothing in the Plan permits Hartford to require an FCE. An examination is not defined as an FCE pursuant to the terms of the Plan. Notably, Plaintiff willingly submitted to the IME, which can be required pursuant to the terms of the Plan, and Plaintiff willingly divulged information in an interview with a representative of Hartford.

Another district court has held in part that where a Plan does not require submission to an FCE, the refusal to submit to one, standing alone, does not warrant denial of benefits. *See Boardman v. Edwards Ctr., Inc. Long Term Disability Plan*, No. CV 02–1384–JE, 2004 WL 1098942 (D.Or. May 17, 2004). There, the court emphasized that the opinions of physicians who have examined the claimant, in general, should be afforded more weight when compared to the opinion of one physical therapist on one FCE. Having found no authori-

ty to support the denial of LTD benefits based on a refusal to submit to an FCE when such is not required under the plain terms of the Plan, the Court finds that Hartford's interpretation of its Plan was "wrong."

## II. Hartford's interpretation as unreasonable

██ It is unreasonable that Hartford denied LTD benefits based on Plaintiff's refusal to submit to the FCE absent clear language in the Plan permitting it to do so. In addition to the fact that the terms of the Plan did not permit Hartford to require Plaintiff to undergo an FCE, Hartford surreptitiously obtained a prescription for an FCE from Plaintiff's family physician, Dr. Hobbs, without permission from Plaintiff. Dr. Hobbs had already instructed Hartford on Plaintiff's physical capacities, yet Hartford attempted to use Dr. Hobbs to effectuate the medical treatment it deemed necessary. While Plaintiff agreed to release all medical information to Hartford, Plaintiff did not agree for Hartford to control and direct his medical treatment, which would include requesting a prescription from his personal physician.

Dr. Baras, Hartford's own physician, did not prescribe an FCE, and Hartford did not prevail upon him to write a prescription for one.[7] Rather, Dr. Baras recommended a work hardening program, which is far different from an FCE. Plaintiff's submission to an FCE, which is not conducted by a medical doctor or with the supervision of a medical doctor, could have caused further injury to an individual who has undergone four surgeries on his spine and neck and who suffers from permanent bruising of the spinal cord. In finding

---

**7.** Interestingly, Dr. Gaines, the neurosurgeon and arguably the most qualified type of physician to prescribe an FCE in this case, did not prescribe one, nor was he asked to prescribe one.

Hartford's denial "wrong" and "unreasonable" under the terms of the Plan and the particular facts of this case, the Court is not holding that refusal to submit to an FCE alone can never justify a termination of LTD benefits. This ruling is therefore limited to the terms of this particular Plan and the unique facts of this case.

It is therefore **ORDERED AND AD-JUDGED** as follows:

1) Defendant's Motion for Summary Judgment (Dkt.20) is **DENIED**.

2) Plaintiff's Disposition Motion for Summary Judgment (Dkt.24) is **GRANTED**.

3) The Clerk is directed to enter judgment for Plaintiff.

4) The Clerk is directed to close the file.