# United States Court of Appeals
## For the First Circuit

No. 13-1564

ROLANDO ORTEGA-CANDELARIA,

Plaintiff, Appellant,

v.

JOHNSON & JOHNSON; MEDICAL CARD SYSTEM, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Baldock,[*] and Kayatta,
Circuit Judges.

Pedro J. Landrau-López, for appellant.
Lourdes C. Hernández-Venegas, with whom Elizabeth Pérez-Lleras, Shiara L. Diloné-Fernández and Schuster Aquiló LLP, were on brief for appellees.

June 16, 2014

---

[*] Of the Tenth Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Plaintiff-Appellant Rolando Ortega-Candelaria ("Ortega") appeals the district court's dismissal of his claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. Before the district court, Ortega sought judicial review of the decision to terminate payment of disability benefits to him under Johnson & Johnson's Long-Term Disability Plan (the "Plan"). Ortega requested a judgment restoring his terminated benefits and ordering payment of past benefits. The district court dismissed Ortega's claims with prejudice.

On appeal, Ortega argues that Johnson & Johnson and Medical Card System, Inc. ("MCS") (collectively, the "Appellees") arbitrarily and capriciously terminated his disability benefits. Ortega contends that the Appellees erroneously credited an examination by a physical therapist over the opinion of his treating physician. Given the substantial record evidence supporting the Appellees' determination, we find that the decision to terminate Ortega's benefits did not constitute an abuse of discretion and was neither arbitrary nor capricious. We affirm.

## I. Background

### A. The Plan

Johnson & Johnson sponsors the Plan to provide long-term disability benefits for its employees and the employees of its affiliated companies. Ortega received coverage under the Plan

while working in Puerto Rico as an electrician for Ortho Biologics LLC, a subsidiary of Johnson & Johnson.

In order to be eligible for plan benefits, a participant must be considered "totally disabled." During the first twelve months of an injury or sickness, a plan participant must be unable to perform the essential functions of his or her "regular job" in order to qualify as "totally disabled." If the injury or sickness lasts longer than twelve months, the participant must remain completely unable "to do any job" -- "with or without reasonable accommodation," and "for which the Participant is (or may reasonably become) qualified by training, education, or experience" -- in order to continue to be classified as "totally disabled."

Pursuant to the Plan, the plan administrator maintains "the right to conduct evaluations of a Participant's medical status and eligibility for benefits" at any time while a claim is pending or the participant is receiving benefits.[1] The Plan further grants the plan administrator the sole discretion "to construe and interpret" the Plan's terms and the sole discretion to determine

---

[1] As defined in the Plan, and as used herein, the term "plan administrator" encompasses both the Johnson & Johnson Pension Committee ("Pension Committee") and MCS, the claims services organization retained by Johnson & Johnson to provide administrative services related to the Plan. "In the event of a denial or limitation of benefits," a participant may appeal to MCS. If MCS upholds the original denial of benefits, the participant may appeal a second time to the Pension Committee. A participant may commence a lawsuit only after a final decision has been rendered on this second appeal.

whether there exist grounds for termination of a participant's benefits.[2] Under the Plan, such grounds include a claimant's failure to cooperate with respect to any procedure or evaluation in connection with the Plan.[3]

A participant making a claim for benefits under the Plan must provide "all information necessary to evaluate his or her medical condition and functional capacity." At the plan administrator's discretion, "the evaluation may include medical examination(s) by a Plan Provider." Further, "[o]ne or more Independent Medical Examination(s) (IME) and Functional Capacity

---

[2] In relevant part, Article VII of the Plan states that the plan administrator "has the sole authority to . . . [e]xercise its discretion to determine eligibility for benefits, to construe and interpret the provisions of the Plan and to render conclusive and binding decisions and determinations based thereon."

[3] In the section titled "Evaluation of Participant's Medical Status," the Plan states that a participant making a claim is required to "cooperate . . . in the evaluation of the Participant's medical status." "Failure or refusal by the Participant to cooperate in the medical evaluation . . . shall constitute grounds for terminating benefits under the Plan."

In a section titled "Exclusions from Payment of Benefits," the Plan further states, in relevant part, that:

> Notwithstanding any other provision of this Plan, in no event shall a Participant be considered Totally Disabled or remain Totally Disabled, and no benefit shall be payable under this Plan . . . on or after the date a Participant . . . fails or refuses to cooperate with respect to the evaluation of his/her Total Disability or continuing Total Disability or with respect to any procedure, evaluation, investigation or audit in connection with this Plan . . . .

-4-

Examination(s) (FCE) may be required at any time during the claim evaluation process."

## B.  Ortega's Claim Under the Plan

As an electrician for Ortho Biologics LLC, Ortega held a "mostly active" job that required "bending, walking, climbing, [and] working [in a] standing position for long period[s] of time," and which required him to "pull, push, lift/carry and squat" on a "routine basis."

Ortega alleges that since 2002, he has been unable to work due to constant pain caused by vertebral herniations, degenerative scoliosis, osteoarthritis, and radiculopathies. He also claims to suffer from anxiety, panic disorder, and depression. As a result of these conditions, Ortega went on non-occupational disability leave, and he began receiving short-term disability benefits on October 28, 2002. Subsequently, on June 3, 2003, Ortega submitted his first claim for long-term disability benefits, in which he asserted that he was unable to bend or walk, experienced consistent pain in his legs and back, and suffered from anxiety, panic attacks, and depression.

Shortly thereafter, MCS received two "Attending Physician Statements" in support of Ortega's claim. The first of these statements addressed Ortega's mental and emotional condition, concluding that Ortega suffered from panic disorder as well as "major depression." The second statement, regarding Ortega's

physical ailments, specified that he suffered from radiculopathies, herniation of lumbosacral discs, degenerative scoliosis, and osteoarthritis.

Ortega's claim for long-term disability benefits for his physical condition was approved on July 23, 2003, but Ortega was notified that such benefits would apply retroactively beginning from June 24, 2003. Ortega's claim for benefits due to his mental-health symptoms, however, was denied. In its subsequent confirmation of the approval of Ortega's physical claim, MCS advised Ortega that he was required to undergo regular treatment with a specialist and that his case would be reevaluated periodically by MCS's Medical Committee to determine his continued eligibility for long-term disability benefits.

On October 20, 2003, MCS requested that Ortega provide a copy of the medical records held by his attending physicians at the time in order to determine his continued eligibility for long-term disability benefits. Thereafter, on October 30, 2003, Ortega participated in a functional capacity evaluation ("FCE") conducted by Rafael E. Seín, M.D. ("Dr. Seín"), a physiatrist, or rehabilitation physician.

Dr. Seín reported that Ortega: "demonstrated a very restricted" -- or "sub-minimal" -- "effort during the weighted and non-weighted activities, with a more mental involvement that aggravates his physical condition"; frequently shifted weight on

either leg despite his major pain symptoms being related to his right leg only; "demonstrated inconsistency" on a hand-grip test; and refused to perform some activities due to fear of being injured. On that basis, Dr. Seín recommended an independent psychiatrist evaluation. He concluded that Ortega had the physical capacity for sedentary work, but with restrictions on prolonged standing, sitting, and walking.

In contrast, in progress notes dated November 4, 2003, Ortega's attending physician -- Oscar E. Ramos Román, M.D. ("Dr. Ramos") -- stated that Ortega was permanently disabled from work, noting that he still suffered from severe neck and back pain, scoliosis, anxiety, and depression. On November 25, 2003, upon reviewing Dr. Ramos's progress notes and the results of the FCE, MCS's independent medical consultant -- José Ocasio, M.D. ("Dr. Ocasio") -- recommended extending Ortega's benefits, but further recommended that Ortega be reevaluated six months later.

On April 6, 2004, Ortega underwent a second FCE, again conducted by Dr. Seín. Following the examination, Dr. Seín's report stated that Ortega demonstrated very inconsistent efforts throughout the FCE and that he refused to attempt several activities, both weighted and non-weighted, which he had performed in the prior FCE. Dr. Seín again concluded that Ortega had the functional capacity for sedentary activities, albeit with restrictions.

-7-

On April 28, 2004, after evaluating Dr. Seín's report, Dr. Ocasio recommended denying Ortega's long-term disability benefits due to his lack of cooperation during the second FCE. However, Dr. Ocasio later reconsidered, and he ultimately recommended approval of the benefits. As before, Dr. Ocasio further recommended that Ortega undergo reevaluation in six months.

On August 19, 2004, MCS informed Ortega that, because Dr. Ramos's progress notes continued to mention Ortega's mental health, MCS was reevaluating the denial of his long-term disability benefits regarding his mental and emotional state. Luis E. Cánepa, M.D. ("Dr. Cánepa"), reviewed a copy of the progress notes regarding Ortega's mental health and concluded that Ortega's emotional conditions seemed moderate in severity. Dr. Cánepa further recommended that Arlene Rivera-Mass, M.D. ("Dr. Rivera"), a psychiatrist, perform an independent medical evaluation of Ortega.

Following this psychiatric medical evaluation conducted on October 13, 2004, Dr. Rivera concluded that, while Ortega presented symptoms compatible with panic and mood disorder, it "seem[ed] that there was a frank exaggeration of symptoms." For example, Dr. Rivera noted that Ortega "claimed extremely poor memory but did not present in the interview [with] such difficulty." Dr. Rivera opined that "the information he gave during the interview is unreliable," and that as a result, further

-8-

investigation should occur in order to correctly diagnose Ortega's mental and emotional symptoms. After reviewing Dr. Rivera's conclusions, Dr. Cánepa recommended denying Ortega long-term disability benefits based on his mental state.

## C. The FCE Conducted by Javier Espina on November 16, 2004

On November 16, 2004, Ortega underwent a third FCE, which was conducted by Javier Espina ("Espina"), a physical therapist. Espina said that Ortega would only be asked to perform activities he felt capable of completing; Ortega could stop any test that caused him pain, if he so desired. Espina further instructed Ortega to exert his best efforts in attempting each activity. Following the FCE, Espina concluded that Ortega's "symptomatic reports and behavior are out of proportion to the objective physical findings and the identified pathology."

Specifically, Espina reported that Ortega: "did not complete all test activities"; "declined all lifting, carrying, pushing, pulling and climbing activities," stating that he did not want to risk further injury; and "demonstrated a consistent sub-maximal effort throughout this evaluation." For example, Espina's report observed that Ortega "declined the (Right Leg) Sitting Leg Raising" test, stating that "he couldn't flex his Right Knee," although the testing center's "video clearly shows that Mr. Ortega [was] able to Sit and Flex his Right Knee" while seated in the waiting room.

-9-

Espina further determined that Ortega "demonstrated a regional, non-specific" testing pattern "that is not consistent with an organic pain syndrome."  Ortega's scores on testing protocols "indicat[ed] that there is a non-organic component to his pain, medical impairment and disability."  During this FCE, Ortega passed only three out of twenty-one "validity criteria," which are used to objectively determine whether a patient is honestly trying his or her best to complete the various physical tasks required for the evaluation.  According to Espina, this fourteen-percent pass rate "suggests very poor effort or voluntary sub maximal effort, which is not necessarily related to pain, impairment or disability."[4]

---

[4]  Espina's report notes that a person's "Validity Profile is comprised of a cohort of individual tests that collectively help determine whether or not the patient is exerting their best effort during all of the FCE tests."  Failing the test indicates that the patient has "not exerted their best effort."  Because "the patient is not asked to perform tasks for which they do not have the physical ability" and "the test data should reveal" if the patient does not have such ability, "then the only reason for not passing the overall Validity Profile is that the patient was not motivated to cooperate with the evaluation process and exert their best effort."  According to the report, "failing the Overall Validity Profile is viewed as a voluntary act of non-compliance with the testing process and the professionals who requested the test."

With respect to the number of validity criteria passed, a rate of 90-100% indicates "Excellent Effort," 80-89% indicates "Good Effort," 70-79% indicates "Fair Effort," 60-69% indicates "Poor Effort," and less than 60% indicates "Very Poor Effort."  Ortega passed only 14% of the validity criteria, leading Espina to conclude that his performance was "Invalid" and demonstrated "Very Poor Effort."

Espina observed that "Ortega's movement patterns improved significantly by distraction" when compared to the ability he demonstrated during direct observation.  Such a finding suggests that Ortega was "attempting to control the test results to demonstrate more pain and disability than [were] actually present." As one example, in evaluating Ortega's gait, Espina noted that Ortega's movements while walking exhibited a "poor correlation with the pain rating" and that his "behavior is inappropriate."  In concluding his detailed analysis, Espina reported that Ortega's behavior and physical performance were not consistent with his stated symptoms and alleged disability.  Instead, Espina concluded that Ortega was, in fact, exaggerating his symptoms and disabilities.[5]

**D.  The Termination of Ortega's Benefits**

On November 22, 2004, after reviewing Espina's report and Dr. Ramos's updated progress notes, Dr. Ocasio recommended denying Ortega long-term disability benefits due to his lack of cooperation during the third FCE.  Accordingly, MCS notified Ortega that, pursuant to the Plan's terms, Ortega's lack of cooperation in the evaluation process justified the termination of his long-term disability benefits.

---

[5]  The report states that "The Movement Patterns and Behavior Are Not Consistent with the Symptoms and Disability," and concludes that "True Symptom/Disability Exaggeration Exists."

On January 12, 2005, Ortega appealed that decision. He attached a letter dated December 10, 2004, in which Dr. Ramos concluded that, in his professional opinion, Ortega was "totally and permanently disabled to work." On January 19, 2005, after reviewing Ortega's records -- including the updated progress notes from all of Ortega's attending physicians -- Dr. Ocasio nevertheless recommended the denial of Ortega's appeal because Ortega presented no new evidence that would support a different recommendation.

Ortega requested a second appeal of his claim on February 24, 2005. He attached Dr. Ramos's signed medical certificate, which stated that Ortega's physical condition was progressive, he still suffered from severe back pain, and he was incapable of performing the tests requested by MCS.

On March 20, 2005, after reviewing Ortega's second appeal, the Johnson & Johnson Disability Review Committee upheld the decision to terminate his long-term disability benefits for failing to cooperate with the evaluations of his continuing disability. Additionally, in its review of Ortega's record, the Disability Review Committee found no circumstances justifying or explaining Ortega's lack of cooperation or his exaggeration of symptoms. Lastly, the committee found that Ortega himself failed to provide any explanation for his "lack of cooperation/compliance in completing the tests that were included in the FCE."

## E. Procedural History

Before the district court, Ortega argued that the Appellees arbitrarily and capriciously denied his benefits due under ERISA, and he requested a judgment ordering the reinstatement of those benefits as well as the retroactive payment of past benefits.[6] After granting Appellees' motion to proceed with the matter as an administrative appeal, the district court granted Appellees' motion for judgment on the administrative record and dismissed Ortega's claim with prejudice on March 26, 2013.

In so doing, the district court held that the record provided the plan administrator ample basis for finding that Ortega did not cooperate fully during the FCE held on November 20, 2004, and thus Appellees did not act arbitrarily and capriciously in terminating Ortega's benefits. This appeal followed.

## II. Analysis

We generally review the denial of benefits under an ERISA plan de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Gross v. Sun Life Assurance Co. of Can., 734 F.3d 1, 11 (1st Cir. 2013) (stating that "[t]he default standard for reviewing [ERISA] benefits decisions . . . is de novo"). However, where the plan grants the plan administrator or another fiduciary the discretionary authority to construe the terms of the plan or to

---

[6] Ortega also sought an award of costs and attorney's fees, plus any other available damages and remedies.

determine a participant's eligibility for benefits, as is the case here, we apply a deferential standard of review, upholding the administrator's decision "unless it is 'arbitrary, capricious, or an abuse of discretion.'"  See Cusson v. Liberty Life Assurance Co. of Bos., 592 F.3d 215, 224 (1st Cir. 2010) (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004).

This deferential standard of review, however, is not entirely without teeth -- it requires that a determination by a plan administrator "must be 'reasoned and supported by substantial evidence.'"  Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 62 (1st Cir. 2013) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 35 (1st Cir. 2011)).  "In short," such a determination "must be reasonable."  Id. (citing Conkright v. Frommert, 559 U.S. 506, 521-22 (2010)).

Specifically, "the question is 'not which side we believe is right, but whether the [administrator] had substantial evidentiary grounds for a reasonable decision in its favor.'"  Matías-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003) (quoting Brigham v. Sun Life of Can., 317 F.3d 72, 85 (1st Cir. 2003)).  Evidence is deemed substantial "when it is reasonably sufficient to support a conclusion."  Cusson, 592 F.3d at 230 (quoting Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005)).  Moreover, so long as substantial

evidence supports the plan administrator's decision, the decision is not rendered unreasonable by the mere existence of evidence to the contrary.  Id.

Although a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," we do not require administrators to automatically grant "special weight" to the opinion of a claimant's chosen provider.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); see also Medina v. Metro. Life Ins. Co., 588 F.3d 41, 46 (1st Cir. 2009) ("A plan administrator is not obligated to accept or even to give particular weight to the opinion of a claimant's treating physician." (quoting Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 (1st Cir. 2007))).  Similarly, courts may not impose "a discrete burden of explanation" on plan administrators "when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker, 538 U.S. at 834.  "Consequently, 'in the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion.'"  Medina, 588 F.3d at 46 (quoting Gannon, 360 F.3d at 216).

On appeal, Ortega raises several arguments in support of his position that the district court erred in granting judgment on the administrative record in favor of the Appellees.  Specifically, Ortega argues that the district court erred in concluding that he

did not cooperate during the third and final FCE. He further asserts that because Espina is not a medical doctor, the plan administrator abused its discretion in crediting Espina's opinion over that of Dr. Ramos. As explained below, we find that these arguments are unpersuasive and do not require reversal.

## A. Whether Ortega Did Not Cooperate with a Required Evaluation

Ortega relies heavily on his assertion that the administrative record lacks evidence that he was uncooperative during the third and final FCE, which was conducted on November 16, 2004. A review of the record, however, reveals significant evidence in support of the plan administrator's decision, as detailed in the foregoing summary of the factual background and as further explained below.

Ortega also argues that the district court erred in finding that because he "had successfully completed evaluations in the past without being found uncooperative," the court could be "confident that he understood how to try the tasks requested of him" during his final FCE, "even if he could not complete every one." Asserting that such a finding was based on a "selective review" of the record, Ortega puts forth two explanations for his lack of cooperation during the third FCE. First, he argues that he did not complete certain evaluation tasks because he was simply following the instructions of both Espina and his treating physician, Dr. Ramos, to avoid actions that could cause him further

-16-

injury.[7]  Second, Ortega notes that there was evidence on the record showing that he was cooperative during earlier FCEs.  He further argues that his medical condition is degenerative, and that it is therefore only natural that he would not be able to complete subsequent tests as well as he had completed prior evaluations.

These arguments misunderstand both the district court's reasoning as well as the relevant standard.  Immediately after finding that Ortega knew how to complete the FCE tasks, the district court further explained: "[i]n any event, the point is not whether every observer would have agreed Ortega-Candelaria was uncooperative, but whether the plan administrator had sufficient evidence to conclude that he was uncooperative."  Indeed, it is certainly plausible that Ortega was suffering from a degenerative condition that rendered him unable, during the third FCE, to perform physical tasks that he had previously been able to perform in prior FCEs.  And it is further plausible that Ortega's refusal to perform certain tasks was not because he was feigning his injuries or exaggerating his symptoms, but was because he was either experiencing severe pain or following his physician's orders not to perform movements that were likely to further injure him.

_____

[7]  According to Ortega, Dr. Ramos informed him that he should avoid certain activities, including: "sitting-standing," bending, walking, pulling, lifting, carrying, and operating foot-pedals. Presumably, Ortega reasons that this medical advice constituted an absolute prohibition, such that he should avoid even attempting such activities during medical or functional evaluations.

Yet the operative standard is not whether Ortega has put forth a plausible narrative, or whether we are more persuaded by Ortega's account of the facts than by Appellees' version. See Matías-Correa, 345 F.3d at 12 ("[T]he question is 'not which side we believe is right . . . .'" (quoting Brigham, 317 F.3d at 85)). Rather, we ask whether the plan administrator had evidence that is "reasonably sufficient" to support its determination. See Cusson, 592 F.3d at 230 (quoting Wright, 402 F.3d at 74).

A review of the administrative record reveals that such evidence was present here. Ortega's assertion that he was physically unable to complete some of the tests does not vitiate Espina's findings that Ortega failed to cooperate by putting forth his best efforts to attempt the tasks requested during the third FCE. While Espina did state that Ortega would not be asked to complete any test he felt unable to perform and that he could stop any task if pain occurred, Espina further instructed Ortega to exert his best effort on each test absent any increased pain.

Despite this instruction, the results of Ortega's final FCE "suggest[ed] very poor effort or voluntary sub maximal effort, which is not necessarily related to pain, impairment or disability." Espina's results suggested that Ortega was "attempting to control the test results to demonstrate more pain and disability" than he was actually experiencing. Ortega refused to perform many of the tasks. His movements while walking did not

correspond with his pain reports. He failed eighty-six percent of the validity criteria, which are used to determine whether a patient is honestly using his or her best efforts to perform the required physical tests.

Video footage further supports the conclusion that Ortega was not cooperative; the video shows Ortega flexing his right knee in the waiting room prior to his final FCE -- an act which he later refused to perform during the FCE itself. Espina's evaluation ultimately determined that Ortega's behavior and physical performance were not consistent with his reported symptoms and alleged disability; Espina thus concluded that Ortega was exaggerating his symptoms.

Moreover, Espina's report was not the first indication in the record that Ortega was exaggerating his symptoms. Dr. Seín reported that Ortega demonstrated a "very restricted" or "sub-minimal" effort during his first FCE. Additionally, Dr. Seín observed that Ortega frequently shifted his weight on either leg despite complaining of major pain symptoms with respect to only his right leg. Ortega also demonstrated inconsistency in his performance of a hand-grip test and refused to perform some tasks.

During the second FCE conducted by Dr. Seín, Ortega demonstrated very inconsistent efforts and refused to perform several tests, including some that he had previously completed in the first FCE. On that basis, Dr. Ocasio initially recommended

denying Ortega's benefits due to this lack of cooperation. Furthermore, following a psychiatric evaluation, Dr. Rivera determined that Ortega gave "unreliable" information and displayed "exaggeration of symptoms" during his examination.

With the foregoing facts in mind, we conclude that the record contains evidence reasonably sufficient to support a determination that Ortega was uncooperative during his evaluation. See Cusson, 592 F.3d at 230 (deeming evidence substantial "when it is reasonably sufficient to support a conclusion" (quoting Wright, 402 F.3d at 74)).

The Plan's terms require that Ortega cooperate during evaluations of his disability status; without such cooperation, the plan administrator retains the right to reduce or terminate his benefits.[8]  Therefore, because the evidence on the administrative record permits a reasonable finding that Ortega was uncooperative during his third FCE, the Appellees' decision to terminate Ortega's benefits cannot properly be deemed arbitrary and capricious or an abuse of discretion.  See Morales-Alejandro, 486 F.3d at 700

_____

[8]  "The Plan Administrator . . . reserves the right to reduce or terminate benefits at any time if it is determined that a Participant no longer qualifies for benefits under the terms, conditions, and definitions of the Plan.  Without limiting the foregoing, failure or refusal by a Participant to . . . cooperate with any other procedures, evaluation, investigation or audit . . . [or] cooperate with respect to the evaluation of a Participant's Total Disability or continued Total Disability . . . shall constitute grounds for termination of benefits under the Plan at the sole discretion of the Plan Administrator or its authorized representative."

(upholding the plan administrator's decision to terminate disability benefits where evidence on the administrative record reasonably supported such a decision); Leahy v. Raytheon Co., 315 F.3d 11, 19-20 (1st Cir. 2002) (holding that where a plan administrator makes a decision supported by substantial evidence, that decision cannot properly be deemed arbitrary and capricious).

**B. Whether Appellees Improperly Relied on Non-Medical Evidence**

Ortega further claims that the denial of his benefits was improper because the plan administrator's decision rested on the findings of a physical therapist rather than those of a physician. According to Ortega, the Plan's terms require a medical evaluation to be conducted by a physician prior to the denial of long-term disability benefits.  On that basis, in Ortega's view, Espina's findings cannot properly support the denial of his benefits because Espina is not a physician, and thus, could not perform a "medical" evaluation as required by the Plan.

This argument fails to carry the day.  Under the Plan's terms, for purposes of evaluating a claim, the plan administrator may require a claimant like Ortega to undergo an examination conducted by a "Plan Provider."[9]  A "Plan Provider" means "a Provider selected by . . . the Plan Administrator to examine or

---

[9]  Article IV of the Plan, in relevant part, states: "[i]n evaluating the claim, the Claims Service Organization may require additional information from the attending Provider(s) or arrange for an examination by a Plan Provider at no cost to the Participant."

evaluate the Participant's medical condition in order to determine his/her Total Disability or continuing Total Disability . . . ." A "Provider," in turn, is defined as "a person who, with respect to any Participant: (a) is legally licensed to provide health care to the Participant; (b) provides such care within the scope of his or her license; and (c) is not a relative or dependent of the Participant."

Ortega does not argue that Espina, as a physical therapist, is not "legally licensed to provide health care" to him. Nor does Ortega argue that conducting the FCE did not constitute "care within the scope" of Espina's license, or that a physical therapist cannot examine or evaluate a person's "medical condition" in order to determine his or her disability status. Rather, Ortega simply argues that because Espina is not a physician, the FCE did not constitute a "medical" evaluation.

Ortega fails to point to any language in the Plan requiring a "Provider" to be a medical doctor, or stating that an examination cannot be conducted by a physical therapist or can only be conducted by a physician. Instead, Ortega merely repeats his assertions that an FCE is not a "medical" evaluation, and that only a physician can perform a "medical" examination. We have repeatedly held that we may disregard such bare, unsupported assertions on appeal. See, e.g., United States v. Delgado-Marrero, 744 F.3d 167, 203 (1st Cir. 2014) (stating that the court need not

-22-

consider "conclusory allegations" or "bare assertions" in an appellant's brief); United States v. Dellosantos, 649 F.3d 109, 126 n.18 (1st Cir. 2011) (deeming an issue waived in light of the party's "perfunctory treatment" of a case and "lack of developed argumentation").

Even assuming that Ortega had not waived this issue for want of developed argument, the Plan's text does not support his position. Had the Plan's drafters intended evaluations to be performed solely by medical doctors, they could have selected the specific terms "physician" or "doctor" rather than a general, inclusive term such as "provider." Moreover, there is strong support in Puerto Rico law for the assertion that a licensed physical therapist is a person who "is legally licensed to provide health care," as required by the Plan. In a Puerto Rico statute governing the licensing of physical therapists, "physical therapy" is defined in part as the "treatment" or "prevention" of any human "disability, injury, illness or other condition of health," "as well as the administration of neuromuscular tests to aid the diagnosis or treatment of any human condition." P.R. Laws Ann. tit. 20, § 241(1).

The requirements for a license to practice physical therapy in Puerto Rico also include the completion of "a course of study at a school of physical therapy recognized by the . . . American Medical Association and/or the American Association of

Physical Therapy."  Id. § 245.  Finally, according to the American Association of Physical Therapy, physical therapists are "licensed health care professionals who can help patients reduce pain and improve or restore mobility."[10]  Thus, the plan administrator had a reasonable basis for interpreting the general term "provider" to encompass licensed physical therapists in Puerto Rico.

Moreover, Ortega has admitted -- and the Plan's terms explicitly state -- that the plan administrator has the right to require one or more FCEs at any time during the claim evaluation process.  In a section titled "Exclusions from Payment of Benefits," the Plan further provides that, "[n]otwithstanding any other provision of this Plan," "no benefit shall be payable" if a participant "fails or refuses to cooperate . . . with respect to any procedure, evaluation, investigation or audit in connection with this Plan . . . whether performed by the Plan Administrator . . . or any other delegate of the Plan Administrator."  This exclusionary provision does not require an "evaluation" or "investigation" to be a "medical" examination or evaluation.  Nor does the provision require that the person conducting an evaluation be a "provider" as defined in the Plan; instead, the evaluation may be conducted by "any other delegate" of the plan administrator.

_____

[10]   Am. Physical Therapy Ass'n, Who Are Physical Therapists?, http://www.apta.org/AboutPTs/ (last updated May 23, 2013).

Ortega has also conceded that the Plan grants the plan administrator the discretionary authority to construe and interpret the Plan's terms. On that basis, Ortega agrees, as he must, that the applicable standard of review is the deferential arbitrary-and-capricious or abuse-of-discretion standard. See Cusson, 592 F.3d at 224; Gross, 734 F.3d at 11. Accordingly, we cannot say that it was arbitrary, capricious, or an abuse of discretion for the plan administrator to interpret the Plan's language as permitting the termination of benefits based on FCE determinations that Ortega was exaggerating his symptoms and was not cooperating with his evaluation. Therefore, Ortega's arguments on this issue are unavailing.

## C. The Effect of Appellees' Failure to Adopt Dr. Ramos's Opinion

Lastly, Ortega relies on the opinion of his treating physician, Dr. Ramos, to establish that he was "totally disabled," in order to discredit Espina's findings that Ortega was uncooperative during the third FCE. Ortega asserts that it was error for the plan administrator to credit Espina's assessment over that of Dr. Ramos.

Ortega is correct that a plan administrator "may not arbitrarily refuse to credit" the opinion of a claimant's treating physician. See Black & Decker, 538 U.S. at 834 (emphasis added). Here, however, Ortega has failed to establish that there was any such arbitrary rejection of Dr. Ramos's opinion or, indeed, of any

-25-

other reliable evidence supporting Ortega's position. And Appellees were under no mandate to grant "special weight" to the opinions of Ortega's attending physician. See id.

Essentially, Ortega asks us to hold that the opinion of Dr. Ramos, as Ortega's attending physician, necessarily controls over contradictory evidence in the record. Such a position, however, flies in the face of our precedent. See Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 (1st Cir. 2010) ("[T]he opinion of the claimant's treating physician, which was considered, is not entitled to special deference.") (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005)); Morales-Alejandro, 486 F.3d at 700 ("[A] plan administrator is not obligated to accept or even to give particular weight to the opinion of a claimant's treating physician.").

Ortega cites several cases from other jurisdictions in support of his argument that an attending physician's medical evaluation should be given more weight than an FCE performed by a physical therapist or another non-physician. Ortega's reliance on these cases is misplaced. The first district court case relied upon by Ortega was later remanded by the Eleventh Circuit and then subsequently vacated upon the parties' settlement. See Ridge v. Hartford Life & Accident Ins. Co., 339 F. Supp. 2d 1323 (M.D. Fla. 2004), vacated, No. 8:03CV1871T26EAJ, 2005 WL 889964 (M.D. Fla. Apr. 7, 2005). Even if Ridge were not a vacated district court

case from another circuit, the factual predicate for its holding is inapposite. In Ridge, the court found that "[n]othing in the Plan defines an FCE, and nothing in the Plan permits [the insurer] to require an FCE." 339 F. Supp. 2d at 1336. Here, in contrast, the Plan explicitly provides that "[o]ne or more . . . Functional Capacity Examination(s) (FCE) may be required at any time during the claim evaluation process."

Ortega next relies upon Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F. Supp. 2d 261 (W.D. Pa. 2008), and Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301 (4th Cir. 2004), abrogated by Williams v. Metro. Life Ins. Co., 609 F.3d 622 (4th Cir. 2010). Ortega emphasizes the Lamanna court's statement that "tests of strength such as a functional capacity evaluation ('FCE') can neither prove nor disprove claims of disabling pain." See Lamanna, 546 F. Supp. 2d at 296. However, Lamanna does not advance Ortega's cause for at least three reasons.

First, the court concluded the sentence highlighted by Ortega as follows: FCEs do not "necessarily present a true picture in cases involving fibromyalgia where the symptoms are known to wax and wane, thereby causing test results potentially to be unrealistic measures of a person's ability to work on a regular, long-term basis." Id. The record here, however, does not establish that Ortega suffers from fibromyalgia. Second, the Lamanna court also explained that "[w]hile the amount of fatigue or

-27-

pain an individual experiences may be entirely subjective, the extent to which those conditions limit her functional capabilities can be objectively measured."  Id. at 296.  Here, the three FCEs sought to objectively measure the limitations of Ortega's functional capabilities, and all three FCEs involved at least some indication that Ortega was exaggerating his symptoms or was not exerting his best efforts.

Third, the Lamanna court found that there were "numerous procedural inconsistencies which demonstrate reliance on medical reviews based on incomplete records, failure to adequately analyze the reports of Plaintiff's treating physicians, and unrealistic demands for objective evidence of fibromyalgia and chronic fatigue syndrome."  Id. at 288.  The court further found that the administrator's decision was not based on substantial evidence because "there were significant omissions, mis-interpretations, and unreasonable expectations in the reports of the medical consultants upon which [the administrator] relied in reaching its conclusion." Id. at 289.  By means of contrast, in the record before us, we have identified neither "numerous procedural inconsistencies" nor "significant omissions, mis-interpretations, and unreasonable expectations" in the reports upon which the plan administrator relied.  Cf. id. at 288-89.

Ortega cites Stup for the proposition that because the FCE in that case "lasted only two and a half hours, . . . the FCE

test results do not necessarily indicate Stup's ability to perform sedentary work for an eight . . . hour workday, five days a week." Stup, 390 F.3d at 309. Unlike the instant case, however, the claimant in Stup had provided the insurer with years of "substantial medical evidence supporting her diagnosis," id. at 311, and the only evidence to the contrary was "[a]n equivocal opinion" that was "based on ambiguous test results." Id. at 310.

The physical therapist in Stup "twice expressly recognized the ambiguity of the FCE results and hedged her negative interpretation of them." Id. The therapist in that case concluded her report by warning "that it would not be 'prudent' to use the FCE results to determine Stup's ability to perform 'specific job duties.'" Id. Here, on the other hand, Espina unequivocally concluded that Ortega was exaggerating his symptoms and disabilities. Espina reported that Ortega failed eighteen out of twenty-one validity criteria, indicating a significant lack of cooperation with the evaluation -- a determination that constitutes grounds for termination of benefits under the Plan. Thus, the reasoning embraced by Stup does not control the result here.

Moreover, all three cases relied upon by Ortega on this issue presumed that a heightened standard of review applies if the defendant has a structural conflict of interest. See id. at 307, 311 (applying a less-deferential standard of review because the defendant "acted under a conflict of interest" -- its dual role as

both payer of benefits and arbiter of claims meant that "its decision to deny benefits impacted its own financial interests"); Lamanna, 546 F. Supp. 2d at 286 (applying "a moderately heightened level of scrutiny" because of the particular conflict of interest caused by the relationship between the claims administrator and the insurer); Ridge, 339 F. Supp. 2d at 1334 ("Because Hartford, as claims administrator, is also the insurance company responsible for paying the claims, the heightened arbitrary and capricious standard [would be] applicable . . . . [if] Hartford operated under a conflict of interest.").

However, the Supreme Court has since clarified that the presence of a conflict of interest does not alter the standard of review, but rather is "but one factor among many that a reviewing judge must take into account." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008). Thus, the standard of review here remains the deferential abuse-of-discretion standard. See id.; Cusson, 592 F.3d at 224. While a conflict of interest "can, under certain circumstances, be accorded extra weight in the court's analysis," Cusson, 592 F.3d at 224, Ortega does not argue that such circumstances are present here.

Contrary to Ortega's arguments, we have previously held that an administrator's decision to terminate disability benefits was not arbitrary and capricious even where that decision was supported in part by an FCE conducted by a physical therapist and

was directly contradicted by the claimant's two treating physicians. See Gannon, 360 F.3d at 213-16. The administrator's decision in Gannon was supported by: an FCE conducted by a physical therapist; the opinion of an "independent medical consultant who reviewed [the claimant's] file"; a transferable skills analysis prepared by a vocational consultant; a surveillance report; and the denial of Gannon's claim for social security disability benefits. Id. at 213-15.

As in the case at hand, the FCE in Gannon "indicated that [the claimant] did not put forth her maximum effort during the tests . . . and that her performance was inconsistent in various ways." Id. at 213. The FCE provided evidence that the claimant was exaggerating her symptoms and that she was physically capable of performing restricted work activities. Id. Given the findings of the FCE and conclusions of the physical therapist, we found it reasonable for the plan administrator to rely upon the FCE as evidence in support of its determination that Gannon was not "disabled" under the Plan. Id.

Similarly, the Tenth Circuit has held that the results of two FCEs -- both administered by physical therapists -- provided substantial evidence upon which the plan administrator could have based its decision to deny benefits. Buckardt v. Albertson's, Inc., 221 F. App'x 730, 735-37 (10th Cir. 2007). Much like Ortega, the plaintiff in Buckardt argued that the "FCEs were not medical

-31-

evaluations" and that an FCE administered by a physical therapist cannot provide substantial evidence for a decision to terminate benefits. Id. at 735-36. The Tenth Circuit disagreed, reasoning that such a position is contrary to the prevailing precedent in several circuits. Id. at 736 (citing Gannon, 360 F.3d at 213, and Jackson v. Metro. Life Ins. Co., 303 F.3d 884, 888 (8th Cir. 2002)).

The Eleventh Circuit has also addressed a similar argument from a claimant maintaining that an FCE from a physical therapist should not have been given more weight than the opinion of the claimant's treating physician. See Townsend v. Delta Family-Care Disability & Survivorship Plan, 295 F. App'x 971, 977 (11th Cir. 2008). In rejecting this argument, the Eleventh Circuit reasoned that "FCEs are routinely conducted by physical therapists" and "plan administrators routinely rely on FCEs." See id.; see also Duncan v. Fleetwood Motor Homes of Ind., Inc., 518 F.3d 486, 489 (7th Cir. 2008); Baker v. Barnhardt, 457 F.3d 882, 885-86 (8th Cir. 2006). Thus, we have not found compelling support for Ortega's argument that a plan administrator cannot rely on the findings of an FCE conducted by a physical therapist.

Even if we were inclined to accept Ortega's theory that a medical doctor's opinion must be given more weight than the opinion of a non-physician, the record here also contains the opinions of medical doctors that support the plan administrator's

decision. As previously summarized, Dr. Seín found -- in two successive FCEs -- that Ortega demonstrated sub-par effort as well as inconsistencies between his reported pain and his physical movements. During each FCE, Ortega also refused to perform some tests. Reviewing the results of the second FCE conducted by Dr. Seín, Dr. Ocasio initially recommended denying Ortega's benefits due to his lack of cooperation. Additionally, Dr. Rivera concluded that Ortega provided "unreliable" information and exaggerated his psychiatric symptoms. Therefore, the record shows that the opinions of several doctors provide further support for the plan administrator's decision.

We have previously held that the mere existence of contrary medical evidence does not render arbitrary and capricious a plan administrator's decision to credit one opinion over another. See Gannon, 360 F.3d at 213. "Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great." Leahy, 315 F.3d at 19.

The plan administrator here reviewed and considered Dr. Ramos's findings, but it ultimately concluded that other evidence in the administrative record -- including Espina's report that Ortega was uncooperative and exaggerating his symptoms -- was more persuasive. On that basis, the administrator exercised its discretion to determine that Ortega was no longer eligible to receive plan benefits for his alleged continuing disability. See

Medina, 588 F.3d at 46 ("[I]n the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion." (quoting Gannon, 360 F.3d at 216)).  Such a conclusion, supported by substantial evidence, is neither arbitrary, nor capricious, nor an abuse of discretion.  See Leahy, 315 F.3d at 18-19 (finding that where a plan administrator's determination that the insured was not fully disabled rests on substantial evidence, it cannot be said that such a decision is arbitrary and capricious).

## III.  Conclusion

Given the contents of the administrative record, the plan administrator's finding that Ortega was uncooperative during his final FCE -- and thus ineligible for continuing benefits -- was reasonable and supported by substantial evidence.  The administrator's decision to terminate Ortega's long-term disability benefits was, therefore, neither arbitrary nor capricious.  In so doing, the administrator also did not abuse its discretion to construe and interpret the Plan's terms and determine whether there existed grounds for termination of Ortega's benefits.  For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**